**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **TROY ARNAUD** | **CIVIL ACTION** |
| **VERSUS** | **NO.   16-2957** |
| **DARREL VANNOY, WARDEN** | **SECTION:   "G"(5)** |

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.   Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).   For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

**Procedural History**

Petitioner, Troy Arnaud, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.   In June of 2011, he was charged by grand-jury indictment with second-degree murder and obstruction of justice.[1]   On April 17, 2012,

---

[1] State Rec., Vol. 1 of 6, Grand Jury Indictment; Minute Entry, 6/2/11.   Co-defendant, Gregory Ford, Jr., was charged in the same indictment with being a principal to second-degree murder (count two).   Both men were charged with obstruction of justice (count three).   Ford subsequently pleaded guilty to an amended charge of manslaughter and

following a two-day jury trial, he was found guilty as charged.[2]    His motion for a new trial was denied.    On April 30, 2012, he was sentenced, respectively, to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence and 30 years imprisonment.[3]

On direct appeal, Arnaud asserted that the trial court improperly denied his motion for a mistrial based on the admission of other-crimes evidence.    On May 16, 2013, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[4]    On March 21, 2014, the Louisiana Supreme Court denied his application for a writ of certiorari.[5]

On July 3, 2014, Arnaud filed an application for post-conviction relief with the state district court.[6]    In that application, he raised the following claims:    (1) the evidence was insufficient to convict him of second-degree murder or obstruction of justice; (2) he was denied the right to testify at trial; (3) he was denied effective assistance of trial counsel for failing to object to the prosecutor's misstatement of law on principals during voir dire,

---

obstruction of justice.    Vol. 1 of 6, Ford Plea Agreement

[2]  State Rec., Vol. 1 of 6, Minute Entry, 4/17/12; *see also* Jury Verdict.

[3]  State Rec., Vol. 1 of 6, Minute Entry, 4/30/12.

[4]  *State v. Arnaud*, 2012-KA-899 (La. App. 5th Cir. 5/16/13), 113 So.3d 1218 (reh'g refused); State Rec., Vol. 1 of 6.

[5]  *State v. Arnaud*, 2013-KH-1985 (La. 3/21/14), 135 So.3d 614; State Rec., Vol. 1 of 6.

[6]  State Rec., Vol. 1 of 6, Uniform Application for Post-Conviction Relief.

waiving opening statement, failing to object to hearsay, failing to properly cross-examine a witness, failing to object when the prosecutor used expert testimony to bolster the credibility of a witness and when he used coercion to prevent Arnaud from testifying, and for placing Arnaud at the scene of the crime in the defense's closing argument; (4) he was denied effective assistance of counsel on appeal for failing to raise insufficiency of the evidence; and (5) unconstitutionality of the state's non-unanimous verdict system.    On February 10, 2015, the state district court denied relief.[7]    Arnaud's related supervisory writ application was denied by the Louisiana Fifth Circuit Court of Appeal on April 14, 2015.[8]    His writ to the Louisiana Supreme Court was denied on March 24, 2016.[9]

On April 7, 2016, Arnaud filed his federal application for *habeas corpus* relief.[10]    In his petition, Arnaud raises only the following grounds for relief:    (1) he was denied the right to testify at trial and (2) he was denied effective assistance of trial counsel for failing to object to the prosecutor's misstatement of law on principals during voir dire, waiving opening statement, failing to object to hearsay, failing to properly cross-examine a witness, lodging no objection either when the prosecutor used expert testimony to bolster the

---

[7]  State Rec., Vol. 1 of 6, State District Court Order denying PCR, 2/10/15.

[8]  State Rec., Vol. 6 of 6, *State v. Arnaud*, 2015-KH-177 (La. App. 5th Cir. 4/14/15).

[9]  *State ex rel. Arnaud v. State*, 2015-KH-1000 (La. 3/24/16), 188 So.3d 1004; State Rec., Vol. 6 of 6.

[10]  Rec. Doc. 1, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

credibility of a witness or used coercion to prevent Arnaud from testifying, and for placing

Arnaud at the scene of the crime in the defense's closing argument.

The State concedes that Arnaud has exhausted his remedies in the state courts and

that the federal application is timely.    The State argues that the claims should be dismissed

on the merits.[11]

### Facts

The following facts were established at trial and summarized by the Louisiana Fifth

Circuit Court of Appeal:

> On Saturday, January 29, 2011, Jonathan Pineda dropped off his brother, Marvin Romero–Pineda, at the Daiquiri Zone in Marrero to have a few drinks and to play pool. Jonathan became concerned when Marvin failed to return home. The next day, Marvin's sister called the police and filed a missing person's report.
>
> On Monday, January 31, 2011, Jonathan called Timmy Palmisano, the owner of the Daiquiri Zone, and informed him that his brother was missing. Mr. Palmisano reviewed the video surveillance of the bar from January 29, 2011, and observed that Marvin, defendant, and another guy were playing pool, drinking, and talking. The three left together in a car at approximately 6:50 or 6:55 p.m. Mr. Palmisano recognized defendant in the video because defendant frequented his bar.[12]
>
> Detective Derek Johnson of the missing persons section of the Jefferson Parish Sheriff's Office subsequently reviewed the video with Mr. Palmisano.[13]  As a

---

[11]  Rec. Doc. 15.

[12]    According to Mr. Palmisano, defendant had been coming to his bar for approximately a year. He testified that defendant and a friend used to visit the bar a couple of times a week and that defendant would also come to the bar with his girlfriend to play pool.

[13]  The video from the bar was not shown at trial because it was only kept on the

result, Detective Johnson developed defendant's name as one of the persons who left the bar with Marvin and brought defendant in for questioning.

On February 7, 2011, after being advised of his rights, defendant gave a recorded statement, in which he claimed that while walking to the Daiquiri Zone he encountered Gregory Ford, got into Ford's vehicle, and drove with him to the Daiquiri Zone. As they were shooting pool at the Daiquiri Zone, they saw a Spanish male who bought everyone drinks. When they were leaving, the Spanish male asked Ford for a ride. Defendant said that the three of them left the bar and got into Ford's car, and that Ford dropped him off at his house in Marrero. Defendant claimed that he left Ford with the Spanish male and that he did not know what happened to the Spanish male after that time.

Following his interview with defendant, Detective Johnson spoke with other witnesses and then decided to speak with defendant again to see if he would release any further information. On February 9, 2011, defendant gave a second recorded statement, in which he said that Ford dropped him off at his mother's house, and not his house as he claimed in his first statement, and that he later walked to his own house. Defendant claimed that at some point that night Ford came to his house and told him that he had blood in the back seat and needed some cleaning supplies. He further claimed that after he gave Ford the cleaning supplies, Ford left and did not return.

Co-defendant Ford gave numerous statements to police during the course of this investigation. In particular, Detective Brett Beavers of the Jefferson Parish Sheriff's Office conducted six interviews with Ford. Although Ford initially lied in his statements, which he admitted to at trial, he ultimately implicated himself and defendant in Marvin's murder. On February 10, 2011, Ford led detectives to Marvin's body which Ford and defendant had hidden in the woods near the River Birch landfill.

During the investigation, a search warrant was executed at defendant's home. While there, the police officers found a Blackberry cell phone case in the corner of the yard. At trial, Jonathan Pineda identified the cell phone case as the same type of cell phone case that Marvin used. The officers also found some shampoo bottles and a scrub brush by the pool. In addition, the officers noticed that there was charred earth, burn marks, and charred clothing along the fence line of the property. Based on their investigation, defendant and Ford were

surveillance system for four days.

arrested and charged with Marvin's murder and with obstruction of justice.

At trial, co-defendant Ford testified as to the specifics of the offenses. According to Ford, on January 29, 2011, he and defendant, whom he had known for twelve or thirteen years, went to the Daiquiri Zone where they encountered Marvin. At some point, Marvin, Ford, and defendant left in Ford's white Dodge Neon. Ford got into the driver's seat, defendant got into the front passenger side seat, and Marvin got into the back seat. Ford drove away from the Daiquiri Zone and entered his neighborhood. As he did so, Ford knew that defendant intended to rob Marvin.

When they got to the first stop sign, defendant exited the front seat and entered the back seat with Marvin. Defendant demanded money from Marvin, showed Marvin a firearm, and started beating him. When Marvin did not surrender his money, defendant got on top of Marvin's back, opened the back door on the driver's side, pushed Marvin's head outside the car, shot him in the back of the head, and then closed the door. Afterward, Ford drove to defendant's house.

When they arrived, they took the body out of the car and placed it on the side of the pool in the backyard. Defendant went to the window and asked his wife for cleaning supplies, which she provided. The clothes were subsequently removed from the victim's body, and the body was washed off. They then placed the body back in Ford's car in the back seat. Ford drove toward Waggaman and eventually pulled over by a wooded area, as he was directed by defendant.

Ford and defendant took the body out of the car, put it over the fence, and dragged it to the woods. Defendant then shot the victim in the back of the head even though the victim was already dead. The victim's facial and genital areas were subsequently burned using gasoline that Ford kept in his car to cut grass. After the fire, they left and went back to defendant's house. Later on, Ford was concerned that the police might find blood in his back seat, so he removed the back seat, threw it in a dumpster, and replaced it with another one.

Michael Thornton, a neighbor of defendant, testified at trial as to what he observed on January 30, 2011. According to Thornton, on that day at approximately 4:00 or 5:00 a.m., he was awakened by people talking across the street. When he looked outside, he saw defendant and another individual standing by a picket fence talking to each other. A short while later, one of the

gentlemen brought a Shop Vac from the backyard and put it into the back seat of a white car.[14]  The person in the white car left but subsequently returned. Sensing that something was not right, Thornton continued looking out of his blinds and saw defendant standing over what appeared to be a barrel with something burning in it.

In addition to lay witnesses, there were several expert witnesses who testified at trial. Dr. Dana Trosclair, an expert in the field of forensic pathology, testified that she performed an autopsy on the victim and determined that the cause of death was two gunshot wounds to the back of the head. She further noted that the victim sustained blunt force injuries on the right forehead and had extensive thermal injury, or burning, to the face, neck, and genital area evidenced by black charring and skin splitting and blistering.

Adriana Perez, an expert in the field of forensic DNA analysis, testified that her testing strongly indicated that blood found in the back seat of Ford's vehicle and DNA found on the cell phone case belonged to the victim.

Colonel Timothy Scanlan, an expert in the fields of firearms identification, tool mark identification, blood stain pattern analysis, and crime scene reconstruction, testified that the physical evidence in Ford's vehicle was consistent with Ford's statement regarding the position of the victim's body when he was killed, as the source of the victim's blood was at or near the doorway behind the driver's side door. Colonel Scanlan also asserted that the evidence tended to corroborate that the victim was subjected to a physical attack as well as a gunshot wound, and he confirmed that the back seat in Ford's vehicle was not the original one.[15]

---

[14]  Detective Brett Beavers testified that during the search of Ford's residence, a Shop Vac was found in a shed in the backyard and taken into evidence. Ford admitted in his last statement that he used a Shop Vac to clean his car after the murder. Adriana Perez, the expert forensic DNA analyst, testified that the Shop Vac was submitted to her, but no samples were considered probative in order to move through the further steps of DNA analysis.

[15]  *State v. Arnaud*, 113 So.3d at 1219-1222 (footnotes in original).

## Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."    *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court

confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.    *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case."    *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Harrington*, 562 U.S. at 102 (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a

vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

A.    *Denial of Right to Testify at Trial*

Arnaud claims that the actions on the part of defense counsel and the state prosecutor amounted to a denial of his right to testify at trial.    He alleges that he informed counsel that he wanted to testify in his defense, but defense counsel told him that the prosecutor would charge Arnaud's wife as an accessory-after-the-fact to second-degree murder if he testified at trial.    He alleges that rather than "alerting the court and objecting to the prosecutor's misconduct," counsel simply relayed the "threat" to Arnaud, which was the sole reason he decided not to testify.    Arnaud cites only his own affidavit in support of these allegations, as he did in state-court proceedings, conceding that "while not much, this was the only evidence Petitioner could gather in support of this claim while he was confined behind prison walls."[16]

The state district court rejected this claim as speculative and unsupported, stating:

The petitioner fails to provide the necessary requirements to support this claim as required by the Louisiana Supreme Court in *State v. James*, 05-2512 (La. 9/29/06), 938 So.2d 691, which states, "Though this Court recognizes that an attorney's interference with a defendant's desire to testify may violate the defendant's constitutional rights, we also require that the claimant 'allege specific facts, including an affidavit from counsel' and point to record evidence to support his claim."    *State v. Hampton*, 00-0522, p. 14-15 (La. 3/22/02), 818 So.2d 720, 729-30.

Petitioner's claim is merely speculative.    Nothing in the record or in

---

[16]    Rec. Doc. 1, p. 22.

petitioner's application supports these allegations.    Petitioner has not met his burden of proof, and this claim will be denied.

Furthermore, as the State points out in its response, petitioner stated on the record, when asked by his trial counsel, that he was choosing on his own free will not to testify in this case.    The court then conducted a colloquy with petitioner, insuring that petitioner understood that his [sic] was his choice, and that he could not be forced to make one choice or the other.

Petitioner, in his traverse, argues that the State failed to address prosecutorial misconduct.    However, he [sic] court finds no merit to this claim.    It is within the District Attorney's power and authority to institute charges, as the District Attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute.    LSA-C.Cr.P. art. 61.

The Louisiana Fifth Circuit Court of Appeal determined that there was no support in Arnaud's writ application for the allegations, and thus no error in the lower court's ruling.    The Louisiana Supreme Court also denied relief, finding "no error in the thorough analysis performed by the District Court" and expressly incorporated the district court's reasons in its decision.

The United States Fifth Circuit recently set forth the controlling law on the issue:

A defendant has a fundamental constitutional right to testify. *See Rock v. Arkansas*, 483 U.S. 44, 49–52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).    A waiver of this right must be knowing and voluntary, and it must be made by the defendant rather than his counsel.    *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1998).    We have held that when a defendant contends that trial counsel interfered with his right to testify, "the appropriate vehicle for such claims is a claim of ineffective assistance of counsel."    *United States v. Mullins*, 315 F.3d 449, 452 (5th Cir. 2002) (internal quotation marks and citation omitted).

*Roddy v. Vannoy*, 2016 WL 7209696, at * 1 (5th Cir. 2016).    "A claim of ineffective assistance of counsel is measured against the standard set forth in *Strickland v. Washington*, which

requires that [petitioner] show both deficient performance by counsel and resulting prejudice.    A failure to establish either prong defeats the claim." *Id.* (citations omitted). Furthermore, because the state courts rejected the ineffective-assistance-of-counsel claim on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

Arnaud argues that trial counsel denied him the right to testify at trial.    His contention is not based on an allegation that counsel refused to let him take the stand despite his expressed desire to do so.    Nor does he allege that counsel advised him against testifying and he followed that advice.    Indeed, there is nothing in the record to show that counsel ever advised him not to testify at trial.    Here, Arnaud alleges only that his decision was influenced by counsel's suggestion based on purported threats by the prosecutor that Arnaud's wife could be charged as an accessory-after-the-fact to murder if he testified, but even that allegation is speculative and supported only by his own subjective, self-serving affidavit.    Moreover, he contradicted his own assertion when he affirmed at trial on the record that it was his choice not to testify.    Regardless, it is clear that a bare and conclusory assertion of the denial of the right to testify by counsel is insufficient to establish ineffective assistance under *Strickland*.    *See United States v. Martinez*, 181 F.3d 627, 628 (5th Cir. 1999) (citing *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991)) ("in a subsequent

collateral attack on [a] conviction the defendant must produce something more than a bare, unsubstantiated, thoroughly self-serving, and none-too-plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand.").

The record in this case plainly demonstrates that Arnaud understood the decision not to testify was his, and his alone, and that he knowingly and voluntarily waived that right. He was questioned at length on the record about his decision not to testify, first by defense counsel and then by the trial judge, to ensure that he understood his rights. He clearly stated for the record that he had decided of his own free will not to testify.[17] He further stated that he knew he would get to "tell [his] side of the story" if he testified, but was standing firm on his decision nonetheless.[18] There is absolutely no indication apart from his own self-serving account that his trial counsel, or anyone else for that matter, interfered with his right to testify. Nor has he even alleged how the outcome of the trial would have been different if he had testified. The state court reasonably rejected Arnaud's claim that counsel rendered ineffective assistance by denying him the right to testify at trial. That determination was neither contrary to, nor an unreasonable application of, *Strickland*.

Similarly, to the extent he claims that his constitutional right to testify was infringed upon by the prosecutor, *i.e.*, misconduct in threatening to charge his wife as an accessory to murder, the Court finds that the denial of relief was neither contrary to nor an unreasonable

---

[17]  State Rec., Vol. 5 of 6 (Trial Transcript – Day 2), pp 170-174.

[18]  *Id*. at 174.

application of Supreme Court law.    As previously discussed, Arnaud provides no evidence besides a self-serving affidavit to show that he was pressured by anyone into waiving his right to testify, and his colloquy actually suggests otherwise.    Despite having had ample opportunity during the waiver colloquy, he did not raise his purported concerns or give any indication that his waiver was anything but knowing and voluntary.    Furthermore, the police had already conducted an investigation and interviewed Arnaud's wife in the year and a half since the crime took place, and the possibility of charges (remote or not) existed based solely on the extent of her involvement, regardless of whether Arnaud testified in his own defense at trial.    As the state district court correctly observed, there could be no prosecutorial misconduct shown because the District Attorney has sole discretion, charge and control over criminal prosecutions in his district and determines whom, when and how he shall prosecute, pursuant to Louisiana Code of Criminal Procedure article 61.    Arnaud cannot prove that any such statement was ever made in the first place, much less that the potential for charges, even if it did exist, would have been mentioned to his defense counsel solely to intimidate or stifle Arnaud and prevent him from testifying at trial.    Accordingly, Arnaud has not shown that he is entitled to relief on this unsupported, conclusory claim.

B.  *Ineffective Assistance of Trial Counsel*

Arnaud raises numerous ineffective-assistance claims which include failing to object to the prosecutor's misstatement of law on principals during voir dire, waiving opening statement, failing to object to hearsay, failing to properly cross-examine a witness, failing to

object when the prosecutor used expert testimony to bolster the credibility of a witness or when the prosecutor used coercion to prevent Arnaud from testifying, and placing Arnaud at the scene of the crime in the defense's closing argument.    The state district court rejected these claims raised on post-conviction relief.    The appellate courts likewise denied relief.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.    *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."    *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.    *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.    *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).    Analysis of counsel's performance must

take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689.    "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"    *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).    A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.    *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    *Strickland*, 466 U.S. at 694.    In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."    *Crockett*, 796 F.2d at 793.

Because the state courts rejected Arnaud's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). In fact, the United States Supreme Court has held that, under the AEDPA, federal *habeas*

*corpus* review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190).

1. Failure to object during voir dire

Arnaud first argues that defense counsel should have objected when the prosecutor misled prospective jurors during voir dire with respect to the law on principals.    Despite the styling of the claim referencing a misstatement of law, Arnaud's actual argument is not that the prosecutor misstated the law of principals itself, but rather, that the prosecutor offered an alleged "misleading hypothetical" to illustrate the law of principals.    The full exchange, including the illustration, reads in context as follows:

> MR. FREESE:
> Now, second degree murder is also the killing of a human being whether or not the offender intends to kill or inflict great bodily harm.    That doesn't seem really fair, does it, you could be held responsible for second degree murder and face a penalty of life imprisonment and you didn't intend that anybody would be killed or have great bodily harm inflicted upon them.    Does that seem fair to you? Mr. Hitzman, does that seem fair to you?
> MR. HITZMAN:
> No.
> MR. FREESE:
> No.    Not unless there's something else involved, right?
> Now, our law says that there are some crimes that people commit that are so serious that it is inherently likely that someone may be seriously injured or killed if you commit this type of crime.    And if someone dies while you, either directly committing it, or as a principal to the crime, if you do it, you commit that crime and someone dies, even if it's an accident that someone died, you're responsible under the law to the full extent as if you had specifically intended to commit that crime.    And crimes that fall into that category are armed robbery and second degree kidnapping. It includes other things, as well, such as rape, killing someone during a drug deal, aggravated burglary.    And if you're engaged in those types of crimes, you're not, as

a matter of law, you don't get the benefit for having bad aim, or because some innocent person fell in your way, or because it was an accident that the person died. Does that make sense to you all?

MR. KERNS:

What is second degree kidnapping?

MR. FREESE:

Okay.    I'm going to come to that in a minute.    Let's talk about one, first, before we go into those elements.    And, again, Ms. Sheppard and I, Mr. Ranier, we all get to talk about what the law is.    We don't instruct you on what the law is; the Judge and only the Judge does that.    We're allowed to talk about it at this stage of the proceedings to kind of help sort through who might be well suited to be a juror.    But it's the Judge, not me, who instructs you on it.

Now, we're also supposed to tell you all the truth.    And, if I misstate anything, she will object and the Judge will call me down on it.    So, it's fair to assume that if I was to say and Ms. Sheppard is saying that we're telling you – we're giving it to you accurately, it's the Judge that ultimately instructs you on the law.

But let's go back to our burglary example.    What I described to you before is what's known as a residence burglary.    But we're going to add, now.    When Mr. Ranier breaks into that house, and while I'm sitting outside as the lookout, he does not expect the Judge to be home, but the Judge is home.    And the Judge defends his property and Mr. Ranier injures him while he is in the Judge's house.    When you injure somebody during the course of a burglary such as that, it becomes an aggravated burglary.    And if that injured person is actually killed, if the Judge were killed under those circumstances, Mr. Ranier would be guilty of the crime of second degree murder, even if he was surprised, had no intention of injuring or killing the Judge when he went in there.    It happened.    And he would be responsible for the fact that the Judge died, just as if he had a specific intent to kill or inflict great bodily harm.    Because if you break into somebody's home, the home of an occupied residence, our law says it is entirely foreseeable that someone could be injured or killed when you commit that type of a crime.    Does anyone have a problem with the idea that Mr. Ranier could be held responsible for the crime of second degree murder, even if he didn't intend to injure or kill the Judge as he struggled with him?    All he wanted to do was get away.    Anyone have a problem with the idea that you would be guilty of second degree murder under those circumstances?

Now, I'm still just sitting in the car.    I didn't know the Judge was home, and I didn't struggle with the Judge, and I didn't engage in any of the acts that resulted in him being dead, or so I say.    Am I guilty of second degree murder?

Ms. Williams, am I guilty of second degree murder?

MS. WILLIAMS:

Yes, because you still had the intent of being involved with him when he went to do the burglary.

MR. FREESE:

Yes.    I participated in that crime, and I am fully responsible for the consequences of that crime.

Anyone disagree with Ms. Williams?

Yes, sir.

MR. BOUDOIN:

I mean maybe I'm being too hypothetical, but we'll take your example. You're sitting in the car, and it's just a planned burglary.    And, someone goes into the Judge's house, and the Judge hears and he comes running, and guns a blazing, and the person in the house is just trying to get away.    And, perhaps, I don't know, he shoots himself or something.    I would have a hard time finding the person sitting in the car, who was just there to drive the car, being charged with second degree murder.

MR. FREESE:

Well, you're adding a whole different element.

MR. BAUDOIN:

I know.    Well, that's what I'm saying.    I was probably being too—

MR. FREESE:

Well, what makes it aggravated burglary is you're armed when you go in or you arm yourself when you go in and you commit a battery on somebody.    Under the scenario I'm describing, I'm trying to make it fairly straightforward.    He either arms himself or goes in armed, and in a struggle with the Judge, the Judge winds up dead.    I'm not trying to add in – that actually makes it kind of cloudy with respect to Mr. Ranier, as well, not just me.    But, you know, if he is guilty of murder, I am guilty of murder because I'm a principal.    Do you have a problem with that?

MR. BOUDOIN:

No.[19]

The state district court denied the claim on post-conviction review, concluding:

[I]t was merely a hypothetical used to accurately explain how one could be charged as a principal to an offense without possessing any intent to commit the crime. The court finds no error in his explanation, as it relates to the crimes for which petitioner was charged as enumerated in LSA-R.S. 14:30.1 (A)(2). Furthermore the petitioner fails to prove any prejudice.    Regardless, the trial court properly instructed the jury regarding the elements of the charged

---

[19]    State Rec., Vol. 3 of 6, Trial Transcript (Day 1), pp. 109-114.

offenses, principles, and attempt.[20]

The intermediate court found no error in that ruling.    The Louisiana Supreme Court denied relief without additional reasons provided.

The prosecution did not misstate the law regarding principals.[21]    The use of hypothetical questions or examples during voir dire is certainly permissible, particularly where, as here, it is used to explore a relevant and valid legal concept.    *See*, *e.g.*, *O'Bryan v.*

---

[20]    State Rec., Vol. 1 of 6, District Court Order denying PCR.

[21]    In *State v. Boudoin*, 11-967 (La. App. 5th Cir. 12/27/12), 106 So.3d 1213, 1224, *writ denied*, 120 So.3d 260 (La. 2013), the Louisiana Fifth Circuit explained the law of principals:

> Second degree murder is defined by La. R.S. 14:30.1(A)(2) as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including aggravated burglary. *State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ denied*, 06–0757 (La. 12/15/06), 944 So.2d 1277.    The law of principals states that all persons involved in the commission of a crime are equally culpable.    *See* La. R.S. 14:24 and *State v. Hampton*, 98-0331 (La. 4/23/99), 750 So.2d 867, 880.    Principals are defined as "all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime."    La. R.S. 14:24.    Thus, one need not possess specific intent to kill or inflict great bodily harm to be a principal to second degree felony murder. *State v. Gurganus*, 03-992 (La. App. 5 Cir. 12/30/03), 864 So.2d 771, 775, *writ denied*, 04-0254 (La. 6/4/04), 876 So.2d 75.    Rather, under the felony murder doctrine, the state need only prove the commission of the underlying felony or the attempt thereof. *Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d at 590.

*Palmer*, 14-11793, 2016 WL 520943, at *7 (E.D. Mich. Feb. 10, 2016) ("defense counsel's failure to object does not violate the first prong of *Strickland* because it was reasonable not to object when the prosecutor's evident purpose was to inquire into a valid area of voir dire examination."   *Id.* (citations omitted); *see also Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998).    The hypothetical in this case was used to illustrate how, in general, one could be held responsible as a principal to a crime.    As the state courts observed, Arnaud failed to demonstrate that the statements were inaccurate.    The hypothetical was proper and defense counsel had no legal grounds on which to object.    Because an objection would have been frivolous and futile, counsel's failure to raise such an objection does not constitute deficient performance.    *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir.), *cert. denied*, 133 S. Ct. 179 (2012) ("failure to assert a meritless objection cannot be grounds for a finding of deficient performance") (quoting *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997)); *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (" '[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.' ") (quoting *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)); *Green v. Johnson*, 160 F.3d at 1037 (failure to make a frivolous objection is not deficient performance below an objective level of reasonableness).

Additionally, even assuming for purposes of this argument that the example given by the prosecutor was objectionable, no prejudice was shown to have resulted from counsel's failure to object to the hypothetical.    First, the prosecutor prefaced his comments to prospective jurors at the time by clearly stating that the trial judge, not the attorneys, will

instruct them as to the law.    Second, jurors were explicitly instructed by the trial court that statements and arguments made by counsel (which encompasses this purely hypothetical factual scenario during voir dire) are not evidence.    They must determine the facts only from the *evidence* presented, which consists of the testimony of witnesses and any other evidence which the Court has permitted the parties to introduce.[22]    It may be presumed that jurors followed the trial court's instructions.    *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000).    Under these circumstances, jurors would not have interpreted the prosecutor's hypothetical explanation of the law of principals as either facts or evidence that could have improperly influenced their decision.    The hypothetical certainly did not, as Arnaud suggests, lead jurors to believe that he was a principal to second-degree murder "simply because of his assistance in cleaning his codefendant's car." [23] Third, jurors in this case were not improperly influenced by a hypothetical factual scenario which did not even involve the circumstances relevant in Arnaud's case, *i.e.*, second-degree murder during the commission of an armed robbery or second-degree kidnapping.    The prosecutor's comments were merely an example of how the law of principals applies generally, not specifically in this case.    For the foregoing reasons, the state court's finding that Arnaud failed to establish deficient performance or prejudice was reasonable. Accordingly, this claim does not warrant federal *habeas corpus* relief.

---

[22]    State Rec., Vol. 5 of 6, Trial Transcript (Day 2), pp. 217, 220.

[23]    Rec. Doc. 1-1, p. 19.

2. Failure to make an opening statement

Next, Arnaud faults defense counsel for not making an opening statement at trial. He alleges generally that the failure to do so "left the jury in the dark as to the defense position, making them more vulnerable to prosecutorial persuasion and also gave the impression that Petitioner did not have a good defense."[24]    Arnaud alleges no specific facts showing how counsel's decision was objectively unreasonable or how the outcome of his trial would have been any different had counsel made an opening statement.    The state district court rejected this ineffective-assistance claim as speculative and conclusory.    The appellate courts likewise denied relief.

The mere fact that counsel decided to forego opening statement does not prove substandard performance for purposes of an ineffective-assistance claim.    Instead, such a decision is strongly presumed to fall within the ambit of trial strategy and professional judgment.    *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) (citing *William v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965) (whether to make an opening statement to jury is "matter of professional judgment")); *see also United States v. Stedman*, 69 F.3d 737, 740 (5th Cir. 1995) (ineffective-assistance claim based on failure to make opening statement failed because movant did not allege how or why trial would have ended differently but for an opening statement).    Although the precise reason for counsel's action here is unknown, that does not make the strategy unreasonable.    The defense's case obviously rested in large part on

---

[24]  Rec. Doc. 1-1, p. 11.

the fact that much of the State's case depended on the jury accepting co-defendant Ford's testimony, which the defense intended to show was highly suspicious and implausible. Strategically perhaps, rather than making a conclusory statement to that effect during opening argument, where it would be of limited beneficial value before any testimony was adduced, counsel wisely chose to assert the position during closing argument at the end of trial, when he judged it would have a more significant impact.[25]    Regardless, apart from Arnaud's self-serving and unsupported assertion that no plausible reason existed for the failure to make an opening statement, he offers nothing to show that the decision by counsel was not strategic in nature.    To reiterate, on *habeas* review, this Court must apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."    *Strickland*, 466 U.S. at 690.    Indeed, federal *habeas* courts presume that trial strategy is objectively reasonable unless clearly proven otherwise by the petitioner.    *Strickland*, 466 U.S. at 689; *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).    Arnaud has not met that burden in this case.

Furthermore, Arnaud has failed to show that he was prejudiced by counsel's omission.    He has not identified any particular facts or relevant information that counsel could have conveyed to the jury in an opening statement which would likely have altered the outcome of the case.    The state court's determination that neither deficient performance nor prejudice were established was not an unreasonable application of *Strickland*.    He is

---

[25]    State Rec., Vol. 5 of 6, Trial Transcript (Day 2), pp. 191-199.

not entitled to relief on this claim.

3.   Failure to object to hearsay

Arnaud claims that counsel should have objected when the prosecutor elicited alleged hearsay from Sergeant David Spera on direct examination.     He cites the following exchange:

Q.     Sergeant, in addition to collecting evidence, was there also a time that you went to the Waggaman area with some other members of the Jefferson Parish Sheriff's Office?

A.     Yes, sir.

Q.     Okay.     And what were you all doing in that location?

A.     We were following directions from information we had retrieved during the investigation.

Q.     And, specifically, do you remember who you retrieved that information from?

A.     Evelyn Arnaud.

Q.     And when you went to that location in Waggaman, what were you looking for?

A.     The body of the victim.

Q.     And were you all able to recover that body?

A.     No.

Arnaud argues that counsel should have objected to this prejudicial hearsay testimony adduced for no reason other than to inform the jury that he must have talked to his wife about the murder and therefore must have been involved in the murder.     He

maintains the prosecution sought to introduce the evidence in this manner rather than directly through his wife who was unavailable because of a marital privilege.    The state district court rejected the claim, finding no deficient performance because the testimony was not hearsay.    Relief was similarly denied in the appellate courts.

Sergeant Spera testified regarding his own firsthand knowledge gained from his investigation and the actions he took during the course of the investigation based on the information he personally received.    He did not offer an out-of-court statement by Arnaud's wife.[26]    Because his testimony did not constitute inadmissible hearsay, an objection would have been pointless and futile, and perhaps even harmful if it focused the jury's attention on the source rather than the information gleaned from the investigation itself.    *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite"); *accord United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."). In fact, even assuming for the sake of argument that the testimony was hearsay, counsel still had a reasonable basis for not raising an objection in her professional judgment.    *Thomas v. Thaler*, 520 F. App'x 276, 281 (5th Cir. 2013) ("panels from this court have recognized that

---

[26]  Louisiana Code of Evidence article 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted."

deciding whether to object before a jury is a quintessential matter of trial strategy not to be second-guessed"); *see also Dodson v. Stephens*, 611 F. App'x 168, 176 (5th Cir. 2011) ("[s]ince an objection may tend to emphasize a particular remark to an otherwise oblivious jury, the effect of objection may be more prejudicial than the original remarks") (quoting *Walker v. United States*, 433 F.2d 306, 307 (5th Cir. 1970)).    The state court's determination was neither contrary to nor an unreasonable application of *Strickland*.    This claim lacks merit.

      4.    Failure to conduct proper cross-examination

Arnaud claims that counsel failed to cross-examine co-defendant Gregory Ford about a past incident at his mother's house.    He alleges that about two weeks before the murder in this case, Ford had called the police to report that soon after he was released from prison someone shot his mother's house several times and was also making threatening phone calls to his mobile phone.    Arnaud attaches a police report documenting the incident which references an "unknown subject/suspect," whom Ford was unable to identify.[27]    Arnaud claims, however that Ford told him the individual who did so was Hispanic and that Arnaud relayed this information to counsel.    Due to the proximity of the other incident and the fact that the murder victim here was Hispanic, Arnaud maintains counsel's failure to cross-examine Ford on the subject fell below prevailing professional norms.    The state district court found no merit to the purely speculative claim and found that he failed to prove

---

[27]    Rec. Doc. 1-5, Exhibit J.    He also refers to Exhibit K, which is Arnaud's personal affidavit.

prejudice.    The Louisiana Fifth Circuit found that counsel's choice was "within the ambit of trial strategy," and therefore Arnaud failed to establish ineffective assistance of counsel. The Louisiana Supreme Court likewise denied relief.

Arnaud has not suggested either that the murder victim was involved in the prior incident or that he had any relationship whatsoever with Ford.    The only alleged *possible* connection is a similar ethnicity, which is based solely on Arnaud's self-serving, subjective affidavit.    His allegation that this line of cross-examination would expose a clear motive for Ford to have committed the murder is not convincing.    The record shows that defense counsel's cross-examination focused on the vast and numerous discrepancies in Ford's six statements to police, directly attempting to discredit him and convince jurors that his testimony implicating Arnaud as the murderer was patently untrue and not worthy of belief. The decision to direct her cross-examination questions to the circumstances surrounding the murder rather than questioning him about some remote, tenuous and unrelated criminal report was an entirely reasonable trial strategy.    *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (noting that because decisions regarding cross-examination are strategic, they usually "will not support an ineffective assistance claim.") (quoting *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)).    Furthermore, even assuming Arnaud could show that counsel failed to act reasonably because she did not cross-examine Ford about the unrelated incident, he has not shown that he was prejudiced by counsel's actions.    He fails to demonstrate how the result of trial would have been different had counsel questioned

Ford about the unrelated incident.    The state court's determination was not contrary to or an unreasonable application of *Strickland*.

    <u>5.</u>  <u>Failure to object to expert testimony</u>

Arnaud claims that counsel rendered ineffective assistance for failing to object when the prosecutor elicited testimony from experts regarding the physical evidence at the scene in order to bolster Ford's credibility.    He complains that questions directed to Colonel Tim Scanlan and Dr. Dana Troxclair, soliciting their opinion as to whether the factual basis of Ford's guilty plea was consistent with the physical evidence found during the course of the police investigation and associated with the autopsy of the victim, were improper.    The state district court found that he failed to establish an improper line of questioning and thus failed to prove deficient performance or prejudice.    The appellate court found no error in that ruling and cited to authority that an objection would have been a vain and useless act. The Louisiana Supreme Court likewise denied relief.

Tim Scanlan (Laboratory Services Commander) was accepted as an expert in the fields of firearms identification and tool-mark examination, bloodstain-pattern analysis, and crime-scene reconstruction.    Dr. Troxclair was accepted as an expert in forensic pathology. Defense counsel stipulated to their qualifications.    During direct examination, the prosecution asked if in their expert opinion, the evidence was consistent with the factual basis of Ford's guilty plea, which the experts had previously reviewed.    Each agreed that it was consistent.    The experts offered opinions that fell squarely within their areas of

expertise, as permitted by Louisiana Code of Evidence article 702.    Their testimony focused on their opinions and observations with regard to the physical evidence that they reviewed, which coincided with the factual version of the events offered by Ford.    Arnaud fails to explain how their expert testimony was improper.    Because any objection to the line of questioning would have been futile, counsel's failure to raise such an objection does not constitute deficient performance.    *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir.), *cert. denied*, 133 S. Ct. 179 (2012) ("failure to assert a meritless objection cannot be grounds for a finding of deficient performance") (quoting *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997)); *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (" '[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.' ") (quoting *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)); *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (failure to make a frivolous objection is not deficient performance below an objective level of reasonableness).    Accordingly, the state court's determination was neither contrary to nor an unreasonable application of *Strickland*.

6.  Failure to object to prosecutorial misconduct

Arnaud contends that counsel was ineffective for failing to object when the prosecutor threatened to charge Arnaud's wife as an accessory-after-the-fact to murder if Arnaud testified at trial.    The state district court's reasons for denying this claim were incorporated in the Louisiana Supreme Court writ ruling:

> Petitioner claims that counsel was ineffective for failing to object to prosecutor's misconduct by threatening to charge petitioner's wife with

> accessory after the fact in [sic] petitioner were to testify on his own behalf. As previously noted (claim #2, above), petitioner's claim is unsupported and purely speculative, as the record reflects that petitioner was not prevented from testifying.    The court finds no deficiency in counsel's performance and no prejudice resulting.[28]

As previously addressed in claim number one, Arnaud's claim of prosecutorial misconduct underlying the purported denial of his right to testify was speculative and unsupported. He has not established that a "threat" to charge his wife if he testified was made.    Even if the potential existed for bringing charges against his wife, that possibility existed without regard to whether he testified at trial or not.    Based on the conclusory allegations and lack of proof, Arnaud failed to establish ineffective assistance of counsel for not objecting to prosecutorial misconduct.    "It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.' "    *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (quoting *Strickland*, 466 U.S. at 689).    The state court's decision rejecting this claim was not contrary to or an unreasonable application of *Strickland.*

### 7.  Mistaken closing argument reference

Arnaud claims defense counsel was ineffective during closing argument when she conceded that he was in Ford's vehicle at the time of the murder without consulting him first regarding that defense position.    He argues that the position contradicted his two statements to police.    The state courts rejected this ineffective-assistance claim, concluding

---

[28]  State Rec., Vol. 6 of 6, 2015-KH-1000 (La. 3/24/16).

that trial counsel's closing argument constituted virtually unchallengeable trial strategy and that he failed to prove either deficient performance or prejudice.    This determination was not unreasonable under *Strickland*.

"Counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."    *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (per curiam).    "Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas."    *Id.*    The Sixth Amendment only "guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."    *Id.* at *8.    "[T]he question is not whether counsel's actions were reasonable.    The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."    *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

A review of the entire defense closing argument, and not just the portion quoted by Arnaud, shows that counsel did not concede that the evidence proved her client was in the vehicle at the time of the murder and therefore guilty of the crime.    Arnaud has never disputed being in the vehicle with Ford and the victim when they left the daiquiri shop, and indeed a witness placed him in the vehicle's front passenger seat, with Ford as the driver, when they all left the shop.    Nonetheless, Arnaud presumably would have preferred for counsel to argue that Ford had dropped Arnaud before the crime occurred—end of story.

Instead, counsel's strategy during closing was to argue that the State's case hinged solely on Ford's testimony regarding Arnaud's involvement and that testimony was incredulous. Counsel laid out Ford's story as it unfolded during multiple police interviews, and argued that he continually lied in an attempt to shift blame, accepted an advantageous plea deal in exchange for his testimony against Arnaud, and that his trial testimony as to how Ford claimed to have witnessed Arnaud commit the crime and to have recalled every single detail while Ford was also driving the vehicle was false and unreliable.    Counsel argued in closing that the evidence indicated that Ford alone possessed the ability and intent to rob the victim and that Ford killed the victim during the robbery and Arnaud was simply in the wrong place at the wrong time.    Arnaud has failed to overcome the presumption that counsel's tactical decision to approach closing argument in this manner was not the result of sound trial strategy.    Furthermore, Arnaud failed to establish material prejudice.    The state court's determination that no prejudice resulted was certainly not unreasonable in light of the instruction to the jury that opening statements and closing arguments were not to be considered as evidence.[29]    It may be presumed that jurors followed the trial court's instructions.    *Weeks v. Angelone*, 528 U.S. at 234.    For these reasons, Arnaud is not entitled to relief on this claim of ineffective assistance of counsel.

        In conclusion, Arnaud has not demonstrated that the state court's decision rejecting these ineffective-assistance-of-counsel claims was contrary to, or involved an unreasonable

---

[29]    State Rec., Vol. 5 of 6, Trial Transcript (Day 2), p. 220.

application of, clearly established federal law, as determined by the Supreme Court of the United States.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Arnaud's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[30]

New Orleans, Louisiana, this ___13th___ day of _____March_____, 2017.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[30] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.